IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

Plaintiff,

Vs. No. 08-40048-01-SAC

RAUOU LURAN ROBERTS,

Defendant.

MEMORANDUM AND ORDER

The case comes before the court on the defendant Rauou Luran Roberts's pretrial motion to suppress evidence including a white Lincoln Town Car, items seized from this car on May 2 and May 8, 2008, and items seized from a search of the residence at 636 Goldbelt Blvd., Junction City, Kansas. (Dk. 16). The defendant's motion challenges that the officers lacked sufficient legal cause for stopping the car driven by him on May 2, 2008, that the officers then unlawfully searched and seized this car, that the affidavit did not provide probable cause for issuing a search warrant on the residence, that items beyond the scope of the warrant were seized from the residence, and that the later search of the white Lincoln Town Car on May 8, 2008, lacked probable cause or exigent circumstances. Having heard the parties' arguments and evidence on July

29, 2008, and having reviewed and considered the parties' supplemental filings, the court is ready to rule.

**INDICTMENT**

The defendant is the sole person named in the indictment that charges him with being a felon on May 2, 2008, and that he possessed ammunition as alleged in count one, and that he possessed two firearms as alleged in count two.

**FACTS**

Even before the events occurring on May 2, 2008, the defendant Rauou Luran Roberts was well known to the police department of Junction City, Kansas, for having committed acts of violence and having possessed or being involved with firearms and controlled substances. In 2002, the defendant openly threatened to kill a deputy who had arrested him on a controlled substance violation. In 2006, the defendant was a passenger in a car which officers searched and found marijuana and large sums of cash. In February 2008, the officers received a report that the defendant had raped his girlfriend and told her he had just purchased a gun and was going to kill her. In March of 2008, officers responded to fight outside of a bar in which the defendant was one of the participants. A

witness stated to officers that the defendant had told one of his associates to "go ahead and do that" and the defendant's friend then pulled a gun and fired it into the air. In April 2008, a citizen came to an officer and said the defendant had pointed a gun at him and had threatened to shoot him. Officers subsequently contacted the defendant, but no gun was found.

Sergeant Todd Godfrey and Lieutenant Michael Life with the Junction City Police Department testified they had received information prior to May 2, 2008, that the defendant was the leader of a group of persons known as "G Block" who lived at the apartment complex at the 600 block of Goldenbelt in Junction City. He was also identified as living in one of these apartments. The information indicated this group was tied with the gang-related activities of the Black Gangster Disciples who were known for wearing black clothing and bandanas. An informant described drug trafficking activity as occurring in the apartment complex's laundry room and believed the defendant to be armed.

Junction City Police Officer Nicholas Blake testified that on April 30, 2008, he was monitoring traffic for violations of the city's loud music ordinance. Blake pulled over a white Buick driven by the defendant for a violation of this ordinance. Because the defendant refused to sign the

notice to appear for the ticket, Blake arrested him and had the defendant booked into jail. During this stop, Blake saw the defendant point his cell phone at Blake's patrol car as if photographing the patrol car. On May 1, 2008, Officer Blake stopped a car driven by the defendant's brother and issued a ticket for loud music. The defendant's brother signed the notice to appear.

On May 2, 2008, around 5:45 p.m., Officer Blake was at his personal residence when he looked out his front window and saw the defendant walking up his driveway toward his home. The defendant was wearing dark pants, a dark shirt, and a dark bandana around his neck. The bandana was tied around the defendant's neck and worn so that it could be easily pulled up over the defendant's face. Upon seeing the defendant, Officer Blake immediately escorted his wife and son to the basement locking the doors behind them. Blake explained his actions as taken out of fear for his family's safety based upon the defendant's history and the absence of any known reason for the defendant to visit his home. In the basement, Blake located his off-duty weapon and took it with him back upstair. Blake heard knocking at the front door, but he remained in the kitchen and decided against answering the door. Blake observed the

defendant walk away from the house and stop at his patrol car which was parked on the street in front of the officer's home. The defendant peered through the patrol car's windows. The defendant then walked to a white Lincoln Town Car which was parked in front of the neighbor's house to the east. The defendant drove away in the car.

Within the next hour,[1] the defendant went to the Junction City Police Department. Using the name of "Marvin Roberts," the defendant identified himself as a "good friend" of Officer Blake and asked a dispatch officer whether Blake was working. Dispatch told the defendant they were unsure of Blake's status but would page the building. When dispatch returned to inform the defendant that Blake was not in the building, the defendant had already left.

Detective Michael Life with the Junction City Police Department learned of the defendant's recent efforts to locate and make contact with

---

[1]The warrant affidavit states the defendant's visit to the police department occurred at approximately 6:12 p.m., after the defendant's visit to Blake's home. The department's surveillance camera records the time of the defendant's visit as occurring earlier at 5:24 p.m. The defendant also introduces an employee time detail report for a Junction City Burger King restaurant on May 2, 2008. The report shows the defendant left his shift at 5:10 p.m. Based on these times, the defendant paints a less threatening scenario of the defendant leaving work in his Burger King uniform, stopping by the police department to see Blake, and then stopping at Blake's home when he saw the officer's patrol car parked there.

Officer Blake. Considering these recent efforts in light of what he knew about the defendant's past and current criminal activities, Detective Life directed officers to contact the defendant about going to Officer Blake's residence. At the hearing, Sergeant Godfrey opined that there was probable cause to believe the defendant had gone to Blake's house with ill intent.

Surveillance was set up immediately on the residence at 636 Goldenbelt[2] which was the place of residence given by the defendant in a traffic stop on April 29, 2008. Officers observed the white Lincoln Town Car parked in front of the apartment complex. Because the apartment complex is located on a frontage road near the interstate highway, a person leaving it must travel east or west for some distance before gaining access to other roads. Officers were stationed in nearby parking lots east and west of the apartment complex.

Around 7:50 p.m., the defendant and a woman were seen leaving the apartments and driving away in the white car. They headed west on the frontage road. The defendant drove past marked patrol units

---

[2]At the traffic stop on April 30, 2008, the defendant told Officer Blake that his residence was on the driver's license, but the address on the license did not match the 636 Goldenbelt address used by the defendant the day before.

and an unmarked car parked in a nearby car sales lot. Though the officers immediately began following the defendant, they quickly lost sight of his car as the defendant began driving in excess of the speed limit. Sergeant Godfrey who was driving one of the police vehicles testified that he believed the defendant was trying to elude the officers. Other units eventually spotted the defendant's car driving away from Junction City on county roads. At some point, Sergeant Godfrey saw the defendant driving recklessly on the county roads. The car was "fish tailing" on the gravel roads and in one turn spun sideways to the point that Godfrey saw the headlights and the front of the car.

Officers eventually stopped the defendant on a gravel road approximately a quarter of a mile from a dead end. Officers asked the defendant his reason for going to Officer Blake's home. The defendant told officers he had only wanted to tell Officer Blake of the officer's mistake in putting the wrong date on the notice to appear.

A canine patrol officer, Timothy Schmidt, received a call for assistance at the traffic stop. He testified that when he came upon the scene he observed the driver and passenger were not in the stopped vehicle but had been "secured" in a police vehicle. There were three

officers already present when Schmidt arrived, and more officers, including Sergeant Godfrey, came later. Officer Schmidt's drug detection dog gave a positive alert during the first walk around the outside of the stopped car. On the second time around the car, the dog jumped inside it and began clawing at the purse.

Sergeant Godfrey testified that upon approaching the white Lincoln he could detect the odor of burnt marijuana. He also learned that the dog had given a positive alert. Godfrey testified that he believed the defendant was handcuffed and standing at the right rear of the stopped car when he arrived. It was believed that a weapon might be in the car. The car was searched, and officers found a marijuana blunt on the passenger floor board, two marijuana seeds on the driver's side floor board, marijuana residue in the ashtray, and marijuana in the passenger's purse.

That same evening, Lieutenant Michael Life prepared a search warrant affidavit for the residence at 636 Goldenbelt. Before taking the affidavit and application to the issuing judge, Lieutenant Life had it reviewed by the assistant district attorney who suggested adding the next to last paragraph. Life testified that based on his years of experience and on the advice of the assistant district attorney, he believed the affidavit

provided probable cause for issuance of a search warrant. Life denied intentionally leaving out or misrepresenting any material fact. Life explained that he did omit inculpatory information received from a confidential informant because of an ongoing investigation.

The warrant was issued at 11:00 p.m. on May 2, 2008, and officers immediately executed it. During the search, they found in plain view, *inter alia*, ammunition in a bedroom and a box for a .32 caliber pistol in the closet of the same bedroom. They seized these items as they knew the defendant was a felon.

**INITIAL STOP**

"The Supreme Court has said there are three types of police-citizen encounters." *United States v. Brown*, 496 F.3d 1070, 1074 (10th Cir. 2007). The first type is a consensual encounter that does not trigger protection under the Fourth Amendment, the second is an investigative detention that constitutes a "Fourth Amendment seizure[ ] of limited scope and duration and must be supported by a reasonable suspicion of criminal activity," and the third type is an arrest that is "the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause." *Id*. (quotation and citation omitted).

The lawfulness of investigatory detentions is governed by the two-prong analysis set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). The first prong addresses "whether the officer's action was justified at its inception." 392 U.S. at 20. The second prong is whether the detention "was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.*

Under the first prong, an officer may detain a person for investigative purposes if the officer has a reasonable suspicion that criminal activity "'is, has, or is about to occur.'" *United States v. Copening*, 506 F.3d 1241, 1246 (10th Cir. 2007) (quoting *United States v. Samuels*, 493 F.3d 1187, 1191 (10th Cir. 2007), *cert. denied*, 128 S. Ct. 815 (Dec. 10, 2007) (No. 07-7509)), *cert. denied*, 128 S. Ct. 2931 (Jun. 16, 2008) (No. 07-9108). "For an officer to have reasonable suspicion to seize an individual, the officer 'must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (quoting *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000)). Reasonable suspicion requires the officer to act on "something more than an inchoate and unparticularized suspicion or hunch." *United States v. Sokolow*, 490 U.S. 1, 7, (1989)

(internal quotation marks omitted). Reasonable suspicion of criminal activity is a "likelihood of criminal activity . . . that need not rise to the level required for probable cause, and . . . falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (quotations and citations omitted); *see United States v. Hauk*, 412 F.3d 1179, 1185-89 (10th Cir. 2005) ("Reasonable suspicion may be established by information that is different in quantity or content and less reliable than the information required to establish probable cause." (internal quotations and citations omitted)). Courts are to view reasonable suspicion as a "fluid concept[ ]" which finds its substance in the particular settings under question. *Ornelas v. United States*, 517 U.S. 690, 696 (1996). Indeed, "[a] determination that reasonable suspicion exists ... need not rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. at 277.

The burden is with the government to prove the reasonableness of the officer's suspicion. *United States v. Salzano*, 158 F.3d 1107, 1111 (10th Cir. 1998). In evaluating a claim of reasonable suspicion, the court assesses the totality of the circumstances, avoids pigeonholing facts as suspicious or not, and "gives deference to a trained

law enforcement officer's ability to distinguish between innocent and suspicious circumstances." *United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997). "A variety of factors may contribute to the formation of an objectively reasonable suspicion of illegal activity." *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998). Courts "may not evaluate and reject each factor in isolation." *United States v. Gandara-Salinas*, 327 F.3d 1127, 1130 (10th Cir. 2003). Arriving at reasonable suspicion is a process dealing with probabilities, not hard certainties, "'as understood by those versed in the field of law enforcement.'" *United States v. Gutierrez-Daniez*, 131 F.3d 939, 942 (1997) (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)), *cert. denied*, 523 U.S. 1035 (1998). Instead of closing their eyes to suspicious circumstances, officers may call on their own experience and training to judge facts and even "perceive meaning in actions that appear innocuous to the untrained observer." *United States v. Gutierrez-Daniez*, 131 F.3d at 942 (citation omitted).

From the testimony and evidence offered at the hearing, the court finds that officers had reasonable suspicion to detain the defendant for investigative purposes and for his traffic violations. Based on his training and experience, Officer Blake reasonably perceived the

defendant's visit to his home as a threat to the safety of him and his family. Officer Blake had information that over the last two months the defendant had pointed a gun at another person and had encouraged one of his associates to discharge a gun in a public setting. Upon seeing the defendant walk up his driveway after having ticketed the defendant and his brother within the last two days, Officer Blake plainly had reason to be suspicious of the defendant's intentions for coming to his home. The defendant was dressed in dark clothes consistent with the garb worn by the gang to which he had been identified. He was wearing a bandana that could be pulled up over his face. The defendant had not called Officer Blake or contacted the police department in advance to announce or prepare the officer for his unexpected visit to the officer's home. The defendant did not park his car in the space available in Blake's driveway but parked in front of a neighbor's house. When the defendant subsequently went to the police department to ask about Officer Blake, the defendant used a false first name and then did not wait to hear back from dispatch's inquiry into Blake's location. Besides these circumstances that justify an investigative detention to determine the defendant's reason for going to Officer Blake's residence, the testimony of Sergeant Godfrey

establishes that the defendant was seen driving in excess of the speed limit and in a reckless manner to elude officers prior to the traffic stop The officers were justified by reasonable suspicion in stopping and detaining the defendant on May 2, 2008, in order to question him about his visit to Offiicer Blake's home and to conduct a traffic stop for his driving violations.

Going to the second prong in determining whether the detention was reasonably related in scope to the circumstances justifying the stop, the defendant complains the officers exceeded the proper scope by handcuffing him. The government failed to present testimony that fixed when the defendant was handcuffed in relation to the officers detecting the odor of burnt marijuana emanating from the stopped car or to the canine's positive alert to the car or to the officers finding marijuana in the car. The testimony of Officer Schmidt and Sergeant Godfrey as presented does not afford a factual basis for finding that the defendant was arrested only after officers had probable cause that the car contained a controlled substance. Nonetheless, the court finds a sufficient record to justify handcuffing and securing the defendant for purposes of the investigative detention.

When officers go beyond the proper limits of a *Terry* stop, their actions will transform the stop into an arrest that requires a finding of

probable cause. *United States v. Copening*, 506 F.3d at 1248. This rule does not foreclose the use of handcuffs during a *Terry* detention:

> The allowable scope of an investigative detention cannot be determined by reference to a bright-line rule; "common sense and ordinary human experience must govern over rigid criteria." *United States v. Sharpe*, 470 U.S. 675, 685 (1985). Moreover, we should not engage in "unrealistic second-guessing" of a police officer's decision. *Id*. at 686.
>
> Thus, a Terry stop does not become unreasonable just because police officers use handcuffs on a subject or place him on the ground. *See [United States v.] Perdue*, 8 F.3d [1455] at 1463 [(10th Cir. 1993)]. Further, the "use of guns in connection with a stop is permissible where the police reasonably believe the weapons are necessary for their protection." *Id*. at 1462 (internal quotation marks, brackets, and citation omitted). "Since police officers should not be required to take unnecessary risks in performing their duties, they are 'authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of [a Terry ] stop.'" *Id*. (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)).

*United States v. Neff*, 300 F.3d 1217, 1220 (10th Cir. 2002). The Tenth Circuit has "upheld police officers' use of handcuffs and guns during a *Terry* stop where they reasonably believe such measures are necessary to ensure officer safety." *United States v. Copening*, 506 F.3d at 1248 (quotation and citations omitted). The question is whether "the facts available to the officer[s] would warrant a man of reasonable caution to believe that the action taken was appropriate." *Id*. (quotation and citation omitted). Put another way, "the use of handcuffs was appropriate as long

as there was a reasonable, articulable ground for fearing danger from the suspects." *United States v. Neff*, 300 F.3d at 1221.

The court believes the officers conducting the *Terry* detention had reasonable, articulable grounds to believe that handcuffing the defendant was a necessary measure for officer safety. Part of the reasonable suspicion for the very traffic stop includes reasonable, articulable grounds for believing handcuffs were necessary for officer safety. Officers were conducting the investigative detention because they reasonably believed that only a couple of hours earlier the defendant had visited an officer's home and then attempted to find the officer's location under circumstances suggesting the defendant harbored ill will for the officer. Officers also knew that within the last two months they had received information of the defendant pointing a gun at another person and having told one of his associates to discharge a gun in a public setting. "'[K]nowledge of a person's prior criminal involvement . . . can . . . be a factor, along with other factors, giving rise to an articulable suspicion.'" *United States v. Ramirez*, 479 F.3d 1229, 1244 (10th Cir. 2007) (quoting *United States v. McRae*, 81 F.3d 1528, 1535 n. 5 (10th Cir. 1996)), *cert. denied*, 128 S. Ct. 1074 (Jan. 14, 2008) (No. 07-7189). Just before the

stop, the officer observed the defendant drive recklessly in an effort to elude them. Thus, the officers had reasonable grounds to be concerned for their safety because of the defendant's demeanor towards one of their fellow officers as well as the defendant's recent possession and control of firearms. On these facts, the court finds a reasonable officer would believe the additional safety measures of handcuffing the defendant would be warranted for officer safety.

**PROBABLE CAUSE TO SEARCH CAR**

The defendant argues the use of the drug detection dog and the search of the car exceeded any proper purpose of the investigatory detention. "A dog sniff of the exterior of a vehicle parked in a public place does not require reasonable suspicion because it is not a Fourth Amendment intrusion." *United States v. Engles*, 481 F.3d 1243, 1245-46 (10th Cir. 2007) (citations omitted), *cert. denied*, 128 S. Ct. 242 (Oct. 1, 2007) (No. 07-5065). The officers did not need additional suspicion to conduct the dog sniff during the investigative detention. *United States v. Ramirez*, 479 F.3d at 1245. Once a properly certified drug-detection canine alerts during an exterior search, officers have probable cause to search the car and its contents. *United States v. Rosborough*, 366 F.3d

1145, 1152 (10th Cir. 2004).

According to Officer Schmidt, one of the two officers who searched the stopped car was Sergeant Godfrey who testified that he noticed the smell of burnt marijuana coming from the car as he approached it. The Tenth Circuit has held that the "smell of burnt marijuana emanating from a vehicle provides probable cause to search the passenger compartment of that vehicle." *United States v. Wald*, 216 F.3d 1222, 1226 (10th Cir. 2000); *see also United States v. Nichols*, 374 F.3d 959, 964 (10th Cir. 2004), *judgement vacated on other grounds*; 543 U.S. 1113 (2005); *United States v. Downs*, 151 F.3d 1301, 1303 (10th Cir. 1998), *cert. denied*, 526 U.S. 1078 (1999). The officers had probable cause to search the car based upon the positive dog alert as well as their own detection of the odor of burnt marijuana. Consequently, the search of the car was justified, and the seizure of the vehicle and evidence found in it was lawful.

**PROBABLE CAUSE FOR SEARCH WARRANT OF APARTMENT**

The defendant advances three challenges. First, the warrant affidavit relies on the fruit of an illegal vehicle search and seizure. This challenge is summarily rejected for the reasons outlined above. Second, the warrant affidavit omits two material facts that make the warrant void:

the car belonged to another person and the amount of marijuana found in the car was small and was not found on the defendant's person. Third, the presence of a small amount of drugs in a car is evidence only of drug use, not drug dealing, and drug use away from the home does not establish probable cause to search the user's residence.

Consistent with *Franks v. Delaware*, 438 U.S. 154 (1978), search warrant affidavits are presumed to be valid and a defendant's challenge to a facially sufficient affidavit is subject to very limited circumstances. *Id*. at 171-72. It is a violation of the Fourth Amendment to "knowingly and intentionally, or with reckless disregard for the truth," include false statements in the warrant affidavit. *Franks*, 438 U.S. at 155. These same standards apply to material omissions in the warrant affidavit. *United States v. McKissick*, 204 F.3d 1282, 1297 (10th Cir. 2000). To establish a *Franks* violation for a material omission, the defendant must first establish by a preponderance of the evidence that officers omitted material information intentionally or with reckless disregard for the truth. *United States v. Tisdale*, 248 F.3d 964, 973 (10th Cir. 2001), *cert. denied*, 534 U.S. 1153 (2002). If the defendant meets this burden, the court will examine the affidavit as if the omitted information had been included to

determine whether the affidavit would still give rise to probable cause. *Id.; see also Stewart v. Donges*, 915 F.2d 572, 583 n. 13 (10th Cir.1990) (opining that not every omission of relevant information will be regarded as material). Probable cause exists when the supporting affidavit sets forth facts that would lead a prudent person to believe there is a fair probability that contraband or evidence of a crime will be found in a particular place. *United States v. Basham*, 268 F.3d 1199, 1203 (10th Cir. 2001) (citing *United States v. Wicks*, 995 F.2d 964, 972-73 (10th Cir.), *cert. denied*, 510 U.S. 982 (1993)), *cert. denied*, 535 U.S. 945 (2002).

The defendant has not come forward with a preponderance of the evidence to show that Detective Life in preparing the affidavit omitted material information or made a false statement intentionally or with reckless disregard for the truth. Detective Life testified that he did not know who was the registered owner of the car when he prepared the affidavit. Consequently, the detective did not aver that the defendant owned the car but that he was seen driving this car in March 29, 2008, when fleeing a bar fight, that the car had been parked at a location which the defendant had given one officer as his residence, and that the defendant had driven this same car just two hours before the investigatory detention. As for the

amount of marijuana and its location in the car, the affidavit nowhere avers or suggests that the amount of drugs is consistent with drug dealing. Instead, Detective Life states only his belief that the residence will contain evidence of "illicit drug use." The affidavit further describes the marijuana and cigarette wrappers as being found in common areas inside the car, and it does not suggest or claim that drugs or paraphernalia was found on the defendant's person. None of the omitted facts are material here. A reasonable reading of the affidavit does not depend on inferences directly related to those omitted facts. The court does not find that the inclusion of the omitted information would have likely altered the magistrate judge's probable cause finding. The defendant has not carried his burden.

As the affidavit does not allege any inferences or beliefs that the defendant was dealing drugs, the defendant argues that evidence of marijuana drug use found in a vehicle driven by the defendant does not provide probable cause to search the defendant's residence for drug use. The question for the court is whether the affidavit offers a fair probability that contraband or evidence of marijuana use could be found in the defendant's residence. *See generally Illinois v. Gates*, 462 U.S. 213, 238 (1983) ("The task of the issuing magistrate is simply to make a practical,

common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."); *United States v. Soderstrand*, 412 F.3d 1146, 1152 (10th Cir.2005) ("An affidavit establishes probable cause for a search warrant if the totality of the information it contains establishes the 'fair probability that contraband or evidence of a crime will be found in a particular place.'") (quoting *United States v. Rice*, 358 F.3d 1268, 1274 (10th Cir. 2004), *judgment vacated on other grounds*, 543 U.S. 1103 (2005)), *cert. denied*, 547 U.S. 1004 (2006). When making a probable cause determination, a magistrate may draw reasonable inferences from the information in the affidavit. *See United States v. Rowland*, 145 F.3d 1194, 1205 (10th Cir.1998).

It is well-established that "probable cause requires a nexus between the place to be searched and the items to be seized." *United States v. Nolan*, 199 F.3d 1180, 1183 (10th Cir. 1999). To prove that nexus, the government need not have direct evidence or personal knowledge that the items sought are actually located at the place to be searched. *See id*. In *United States v. Rowland*, 145 F.3d at 1204, the

Tenth Circuit emphasized that “[p]robable cause to search a person's residence does not arise based solely upon probable cause that the person is guilty of a crime. Instead, there must be additional evidence linking the person's home to the suspected criminal activity.” *Id*. (citations omitted). Probable cause exists when “the facts presented in the affidavit would warrant a man of reasonable caution to believe that evidence of a crime will be found at the place to be searched.” *United States v. Hernandez-Rodriguez*, 352 F.3d 1325, 1330 (10th Cir. 2003) (internal quotations omitted).

The defendant argues that marijuana use “is ubiquitous among U.S. citizens” such that the marijuana could have belonged to the owner of the car and had no logical connection to the defendant’s residence. (Dk. 16, p. 12). That the vehicle is registered to another person does not change the facts that the defendant had been seen using this car repeatedly and had used it for at least two hours prior to the traffic stop. The affidavit states that the defendant during the traffic stop on April 29th gave 636 Goldenbelt as his residence but on April 30th during a second traffic stop gave a different residence. One can reasonably infer that with the second traffic stop the defendant was concerned that he may be a

target of an investigation and chose to protect the location of his residence. The officers saw the defendant and the woman leave the residence together, and they were not seen to have made any stops where they could have acquired the marijuana or drug paraphernalia before the officers detained them. After leaving the apartment parking lot, the defendant quickly assessed that officers were following him. Instead of turning around and seeking the protection of his own home, the defendant tried to elude the officers by speeding and driving recklessly on country roads outside of town. The affidavit sustains reasonable inferences that once the defendant suspected he was the target of an investigation that he made calculated decisions to keep officers from knowing where he lived. Based on these reasonable inferences and the presence of illegal drugs in the car being driven by the defendant, there is probable cause to believe the defendant had additional contraband in his home that he did not want officers to find.

Even assuming probable cause of a nexus to the defendant's residence is lacking, the court determines that the good-faith exception to the exclusionary rule established in *United States v. Leon*, 468 U.S. 897 (1984), applies here. "Where an officer acting with objective good faith

obtains a search warrant from a detached and neutral magistrate and the executing officers act within its scope, there is nothing to deter." *United States v. Nolan*, 199 F.3d at 1184 (citing *Leon*, 468 U.S. at 916). In making this determination, the court "must examine the underlying documents to determine whether they are 'devoid of factual support.'" *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000) (quoting *United States v. McKneely*, 6 F.3d 1447, 1454 (10th Cir. 1993)). The affidavit here is not so lacking in indicia of probable cause that the executing officers should have known the search was illegal despite the issuing judge's authorization. *See Leon*, 468 U.S. at 922 n. 23. Detective Life testified that from experience he had obtained search warrants on residences under similar circumstances and that he took this affidavit and warrant application to the assistant district attorney for approval before submitting it to the state district court judge. Detective Life explained that the prosecutor also was knowledgeable of reports on the defendant's criminal activities and provided the information found in the last paragraph of the affidavit. Considering all these circumstances, the court believes a reasonable officer, knowledgeable of the controlling law, would not have known the search was illegal here despite the magistrate judge's authorization. The

"good-faith" exception thus applies.

**SEIZING ITEMS OUTSIDE SCOPE OF WARRANT**

The defendant complains that while the warrant authorized a search only for "marijuana, drug paraphernalia, and items which help identify persons in control of the premises," the officers exceeded its scope in seizing ammunition and a box for a pistol from a bedroom. The defendant points out that these seized items do not fall within the scope of the warrant and do not have any logical nexus to it.

On this issue, the Tenth Circuit law is as follows:

> We begin our analysis by noting that "the general rule," where executing officers exceed the scope of a warrant, "is that 'only the improperly seized evidence, not all of the evidence, must be suppressed, unless there was a flagrant disregard for the terms of the warrant.'" *[United States v.] Hargus*, 128 F.3d [1358] at 1363 [(10th Cir. 1997)] (quoting *United States v. $149,442.43 in U.S. Currency*, 965 F.2d 868, 875 (10th Cir. 1992)). In the vast majority of cases, "a search is not invalidated merely because some things are seized that are not stated in the warrant." *Id*. "This is particularly true when the non-specified items are not admitted into evidence against the defendant." *Id*.
>
> In very rare cases, however, we have applied the unusual remedy of blanket suppression. In *United States v. Medlin*, 842 F.2d 1194 (10th Cir. 1988), for instance, we ordered a blanket suppression of all items seized pursuant to a federal warrant authorizing a search for "firearms." *Id*. at 1195. In that case, local officers who did not possess a separate warrant entered the residence with the federal officers, and the local officers seized "667 items of property none of which were identified in the warrant authorizing the search." *Id*. at 1196. We held that the officers, by seizing so many items not

> mentioned in the warrant, exhibited a "flagrant disregard" for the terms of the warrant and actually "transformed" the otherwise valid warrant "into a general warrant." *Id*. at 1199.

*United States v. Le*, 173 F.3d 1258, 1269-70 (10th Cir. 1999).

The lessee of the apartment told officers executing the search warrant that the defendant and his girl friend lived in a particular bedroom. In looking for marijuana and paraphernalia, officers found in plain view in the same bedroom the ammunition and firearm box. Because the officers knew it was a crime for a felon and/or a drug user to possess a firearm, it was immediately apparent to them that the ammunition and firearms box was evidence of a crime committed by the defendant who was a felon and drug user. Thus, it was proper for the officers to seize such evidence in plain view of the officers who were lawfully in the residence executing a search warrant in good faith. *See Le*, 173 F.3d at 1270-71.

**SECOND SEARCH OF CAR**

Following the defendant's arrest, the car he was driving was searched and impounded. While the defendant was incarcerated, the officers searched the car again on May 8, 2008, without a warrant. The officers found documents and photos evidencing the defendant's control of the vehicle. The defendant's argument that the vehicle was unlawfully

seized has been addressed and rejected above. The defendant further contends the later search was done without probable cause or exigent circumstances.

"Under the automobile exception, 'police officers who have probable cause to believe there is contraband inside an automobile that has been stopped on the road may search it without obtaining a warrant.'" *United States v. Oliver*, 363 F.3d 1061, 1068 (10th Cir. 2004) (quoting *Florida v. Meyers*, 466 U.S. 380, 381, 104 S.Ct. 1852, 80 L.Ed.2d 381 (1984) (per curiam)). Courts have not imposed a strict temporal restriction on the execution of a search pursuant to this exception:

> Furthermore, "the justification to conduct such a warrantless search does not vanish once the car has been immobilized," *Michigan v. Thomas*, 458 U.S. 259, 261, 102 S.Ct. 3079, 73 L.Ed.2d 750 (1982) (per curiam), and "[t]here is no requirement that the warrantless search of a vehicle occur contemporaneously with its lawful seizure." *United States v. Johns*, 469 U.S. 478, 484, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985); *see Texas v. White*, 423 U.S. 67, 68, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975) ("police officers with probable cause to search an automobile at the scene where it was stopped could constitutionally do so later at the station house without first obtaining a warrant"). Accordingly, a container in a vehicle may be searched without a warrant within a reasonable time after its removal from the vehicle. *See Johns*, 469 U.S. at 480, 105 S.Ct. 881 (approving "a warrantless search of packages several days after they were removed from vehicles that police officers had probable cause to believe contained contraband"); *United States v. Corral*, 970 F.2d 719, 726 (10th Cir.1992) (because police had probable cause to believe that package in automobile contained contraband, automobile exception

permitted package's warrantless seizure and subsequent search at police station).

*United States v. Oliver*, 363 F.3d at 1068; *see also United States v. Fierros-Alavarez*, 547 F. Supp. 2d 1206, 1211 (D.Kan. 2008). The warrantless search here less than a week after its seizure is lawful.

IT IS THEREFORE ORDERED that the defendant's motion to suppress (Dk. 16) is denied.

Dated this 21st day of August, 2008, Topeka, Kansas.

s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge